Good afternoon. Ms. McKee, would you announce our case for argument, please? Yes, Your Honor. Case number 24-2332 and case number 24-2351, both from the District of Eastern Missouri, State of Missouri, et al. v. Joseph Biden, Jr., et al. Good morning, and may it please the Court, Thomas Fulham for the Department of Education, and I will be reserving four minutes for rebuttal. The plaintiffs' states seek to cast aside decades of consensus regarding the operation of income-contingent repayment plans and harm millions of borrowers who have relied on those plans. I'd like to make four points today, one about the alleged harms that plaintiffs rely on to establish standing in irreparable harm, one point about the merits of their challenge, one about the public interest, and one about the scope of the requested relief. First, on the harm. The Supreme Court held in Nebraska that Missouri suffers a cognizable harm when accounts serviced by MoHELA are prematurely closed. The only challenge provision that could cause such an injury is the shortened timeline to forgiveness for certain borrowers with smaller loans. This was the theory that the district court relied on to support standing in irreparable harm when it said, the final rule calls for accelerated loan forgiveness for a set of borrowers with low initial principal balances, and MoHELA will lose revenues from administrative servicing fees when those accounts are forgiven. That's on A36 of the addendum. Then on A56, the Court said, plaintiffs' alleged harms are entirely focused on the final rule's early loan forgiveness provisions, and this is what they seek to stop. If the district court was correct in its assessment of standing in irreparable harm, then Article III in equitable principles would restrict relief to, at most, harm caused by the shortened timeline to forgiveness. Second, on the merits. The HEA requires the secretary to offer a plan for income contingent repayment. The statutory language sets out two principles. One, payments must be based on income, and two, payment can only last for a defined period of time. Before you move on, you blew through your standing argument there pretty quickly. As I read it in the briefs, you were arguing that MoHELA was actually going to benefit from this program, and is that the way I understand it? Yes, we believe it does not have standing to challenge even the shortened timeline to forgiveness. I guess that's my question, is do you have any cases in the standing context that suggest we should offset a benefit that they might get against a loss that they might get? Yeah, we cited cases from the Third Circuit and the Fifth Circuit that said when both benefits and costs come from the challenged action, and they're of the same type and caused by the same event, that a court can take both into account when assessing standing. And the Third Circuit explained that's to determine whether there is a real financial loss. We're looking at a real-world injury there, and we believe it falls within that category. And again, that's for the shortened timeline to forgiveness. We believe that for the other provisions, it's just clear that there's no standing at all. So on the merits, we believe the only type of plan that complies with both of the principles set out in the statutory text is one that provides for the forgiveness of any balance that remains at the end of the payment term. The ICR statute, therefore, clearly provides authority for loan forgiveness. Now, clear authority need not be expressed, as Missouri maintains. The Supreme Court recently made this clear in the Kurtz decision, which arises from the sovereign immunity context, where a waiver of sovereign immunity must be unmistakably clear. If more were needed, the context confirms what the plain language indicates. How long has this ICR statute been in place? 1993. And isn't this the first time there's been a massive attempt to forgive loans under this ICR provision? And my question is, if that's true, if it's so clear, why would this be the first time? So no, ICR plans have provided for the forgiveness of any balance remaining at the end of the payment term since the very first plan was adopted, the original ICR plan provided for forgiveness. At the end of the payment term? Exactly. It would be paid in full. No, if the... So the payment term is defined by the secretary, a period that can't exceed 25 years. And the amount of payment was set as a percentage of the borrower's income. So if the borrower made all of those payments of a percentage of the borrower's income, and at the end of the payment term, then it was 25 years, if those did not add up to cover the full amount of the loan, any leftover was forgiven. That was the same in the pay plan that was adopted about 10 years later. It was the same in the repay plan that was adopted a few years after that. What happened here was that the secretary adjusted some of the parameters of the repay decision by increasing the amount of income that is protected from repayment by decreasing for some borrowers, borrowers with only undergraduate loans, the percentage of income that had to be devoted to payments. And then for some borrowers with... smaller initial principal balances, the secretary set a shorter payment term that payments would last for somewhere between 10 and 20 years instead of 20 years as under pay. So all that happened was there was some, you know, adjustment to the parameters of this program. It wasn't a brand-new program. And we think that that makes it unlike any other case where the Supreme Court supplied the major questions doctrine. But even if that doctrine did apply, as I've indicated, we believe that the statute clearly provides the authority for the loan forgiveness. Let's talk a little bit about that. Prior to the ICR statute, I think you said 1993. That's right. Is it true that the standard repayment was 10 years? So prior to the ICR, the standard repayment plan was adopted at the same time as ICR. The direct loan program as a whole was adopted in 1993. And Congress provided multiple payment options for borrowers under the direct loan program. One was the standard plan. Another was income contingent repayment. Now, income-based repayment that Missouri talks about quite a bit was added later. That was added in 2007. So over a decade... Were all of those other terms less than 25 years? The standard payment plan can be no more than 10 years. There's an extended payment plan that can be no more than 25 years. Okay, so tell me why I'm reading this statute wrong. It talks about a variety of repayment, a variety of plans for repayment, not forgiveness, repayment, including principal and interest on the loan, which sounds like you've got to repay all the principal and all the interest. And then it goes on to talk about the borrower may choose an income contingent repayment plan with varying annual repayments amounts based on income paid over an extended period of time not to exceed 25 years. This seems to me, and correct me, but that that's basically saying if you don't have enough income, the secretary can lower the amounts and extend it, but it still all needs to be repaid in 25 years instead of the 10 years. Why isn't that the intent of Congress here? Well, for a few reasons. One, if, as Your Honor suggests, the borrower's income is too low, then when we get to the end, the final payments will just balloon to cover the whole balance of the loan. Those payments will not have any relationship whatsoever to the income of the borrower. I think what it's doing is it's suggesting normally you'd have to pay it over 10 years, right? And they're saying, I think, the way I'm reading it, and this is your chance to convince me otherwise, is that they're saying, well, we'll extend it over 25 years, that if you don't have enough income to cover it, we're going to give you two and a half times the length of time to be able to pay it. Well, the extended payment plan already gave a longer time period, so the longer time period is not enough. Was it 25 years? I'm sorry? Was it 25 years? I believe it is 25. The statute doesn't say that, but I believe as it's been implemented, I think it depends. These get very complicated in the details, but it is for a longer period of time. But if I could just make one point about the income contingent repayment plan, by its terms, calls for repayment that's contingent on income. Contingent means possible or uncertain. So if a borrower does not have sufficient income to cover all the payments, then those payments can't be made. That was the understanding of the Department when it proposed this language and informed Congress. It might be the understanding of the Department, but is it the intent of Congress? Well, knowing what the Department said this meant, Congress enacted the statute. The Department implemented it in 1993, maintained that understanding. Congress passed amendments in 2007, one of which said that this is 1087EB7, said that in calculating the period of time for which payments shall be made, it includes periods where the borrower is in deferment due to an economic hardship. This only makes sense if there's forgiveness at the end, because otherwise Congress would have been saying, okay, borrowers who have economic hardship, we're going to make it even harder for you to pay off your loans by counting that time during which you were in hardship towards your repayment. So Congress clearly understood how this worked and adopted amendments that only make sense based on that understanding. Let's talk about the word repayment. This case is pretty complicated, but I'm going to start with what seems to be a basic question. Congress authorized a repayment plan, but if the borrower's payments are reduced to zero and then forgiven, how is that a repayment plan? So the borrower's payments are zero only for the time when the borrower's income is insufficient to make any payment, because their income is sufficiently low that they can't cover the necessities of life, food and utilities and that kind of thing. Isn't that only after they raised the level from 150% of the poverty level to 250% and changed it from 10% to 112th of 5% and all these changes? So for many borrowers, it's zero. It's zero only for borrowers whose income does not pass the level in the kind of threshold provision, so that would be the 225. The 5% and 10% is a different provision. But even under the very initial ICR plan, there was a cap of 100% of the federal poverty level. In pay, that was increased to 150, and in IBR, Congress set it at 150. I see my yellow light is on. I'd like to reserve some time. Mr. Pohn, it's an important case, and if you use all your time, I'll probably give you a couple of minutes. But how do you respond to the argument that in other situations, like under IBR, Congress explicitly allows and provides for explicitly loan forgiveness, but didn't do so in ICR, which is what we're talking about here? Yeah, so I have a couple of responses. One, Missouri invokes a kind of negative inference by that. The Supreme Court has explained that that negative inference applies when the provisions are enacted at the same time. Here, IBR was enacted much later, so it doesn't have the same strength there. Second, the point of IBR was, as the legislative history makes clear, was to build on and expand what was offered in ICR. So Congress saw what was available in ICR, which is only for borrowers through the direct loan program, and it extended IBR to fell borrowers. So these were people who couldn't get the benefit of ICR, and Congress said, well, now you can get it, too. And Congress set certain parameters for that program that were more generous than under ICR, and it did say these have to be repaid. I'm sorry, it gave an instruction to the secretary to repay these loans because fell loans are issued, and unless they've been acquired later by the department, are still held by private entities. So there has to be an additional step by the department to make those loans go away. That's the kind of express forgiveness. It told the secretary, okay, now once we've reached the 20 years, you pay off those private entities. So it makes sense there, and it makes sense in the PSLF, which is another program that Missouri relies on. PSLF is not a payment plan. Borrowers who are in that program are making payments through other plans, including ICR. And those plans, generally, except for the standard repayment plan, which is the same length as PSLF, have longer terms. So if someone's participating in PSLF and reaches their 10 years of qualifying payments, they would have to keep paying under the plan unless Congress said, no, forgive those loans early, and that's why that language needs to be there. So we have totally different situations. I would like to cover just at least the public interest. This Court has repeatedly said that an injunction should maintain the status quo. The states appear to agree with that. The status quo when they brought their suit was that millions of borrowers were making payments under save towards eventual forgiveness. The status quo before the rule was enacted, even in June 2023, was that forgiveness was available for borrowers who made 20 or 25 years of payments. The plaintiffs don't seek to return to either status quo. They want to go back to before the ICR statute was enacted. Such relief, which goes beyond what they asked for in district court, disrupts the reliance interests of millions of borrowers on ICR plans who have planned for years and maybe over a decade on receiving forgiveness and may have made significant life choices based on those. Mr. Polam, your time's expired. Okay. Thank you very much. I'll allow you a couple minutes in rebuttal, even though you could have preserved a little bit of it. But go ahead. I'll give you a couple minutes. Mr. Devine? Good afternoon. May it please the Court. Joshua Devine, Solicitor General of Missouri, appearing on behalf of the plaintiff states. We have here the federal government's Plan B for mass canceling up to $500 billion in student loans. And like most sequels, this one is worse than the first. Congress created a repayment plan, emphasis on repayment, that says that payment amounts can vary year to year as your income goes up and down, and you can take up to 25 years rather than the standard 10. And from this rather unassuming text, my friend on the other side asserts an interpretation that would give the Secretary authority to cancel every penny of every loan. The problem, of course, is that extraordinary assertions of authority like that one require exceedingly clear statements by Congress, and this the Secretary doesn't have. I would like to highlight four major points today. The first, I didn't hear my friend on the other side talk about the major questions doctrine, but that is doctrinally the most straightforward path for this Court. As the district court put it, quote, there is no real dispute that the major questions doctrine applies. It is triggered whenever there is a regulation of vast economic and political significance. That was true in Biden against Nebraska, so it's necessarily true here as well. And so for the Secretary, that is game over, because they cannot satisfy this exceedingly clear statement requirement. What they say instead is that they can, they say they can divine two principles from the text, and that if you put those principles in combination and kind of look through the kaleidoscope, you can get to forgiveness. But the very fact that they're talking about inference and implication is fatal for them under the major questions doctrine. Now, yes, it's true that the initial ICR program in theory authorized forgiveness, but it was exceptionally rare. What this program does is it changes that very, very exceptionally rare forgiveness from the original ICR program into the norm, to where people in the 98th income percentile, individuals at big law firms in New York, they can get forgiveness under this program. So this is a lot like the utility error case that this court cited in the injunction pending appeal opinion, where the EPA said, okay, well, we have previously regulated a few stationary sources, and so now we're going to regulate thousands and thousands and thousands of more stationary sources. On the plain text, the second point I'd like to highlight, Judge Grunder, I understand the plain text the way that your questions earlier were suggesting, and so I want to talk a little bit at a higher level, which is that they have no limiting principle to their interpretation. They can't explain why they can't use, why they couldn't use the same interpretation to cancel every penny of every single student loan. And so set aside the major questions doctrine, set aside the text, that's just a problem they have on precedent, because Biden against Nebraska last year, it interpreted not just the HEROES Act, which is a subset provision of the Higher Education Act, but it interpreted on 484 the entire Higher Education Act. It canvassed the legal authorities that the Secretary has, and the Supreme Court said, and I quote, Congress opted to make debt forgiveness available only in a few particular exigent circumstances. That's the Supreme Court's binding interpretation of the Higher Education Act. And so this forgiveness for nearly everybody is completely contrary to that binding precedent, and they've never been able to try to explain that precedent away. Because time goes so quickly, I'd like to jump back to standing. Yes. You can come back to this if you want, but I'd like you to tell me what the basis is for the state's standing as to the interest accrual and payment threshold provisions. I think there are a couple different, I think there are three probably different ones there. Number one, the interest accrual, anything that is decreasing the actual amount of the loan means that people can pay off their loans faster, and so that's going to decrease the lifespan of the accounts. So let me give you an example from the Biden against Nebraska case. That was going to cancel $10,000 from everybody's accounts. If you have an account that is $10,001, well, it wasn't going to cancel the account, but of course the borrower is immediately going to be able to repay the account in the next month. And so even if it wasn't canceling the account, it was greatly shortening the lifespan of the account. So that's number one. Number two, the Ascendium case that we cite from the D.C. Circuit says that because vacater is the regular rule in the APA context, you just need to identify one part of the rule that injures you, and then you can advance any legal theory that would lead to vacater. And then number three, we have this FFEL, these loans that... So recall that Mohila not only services loans owned by the federal government, but we have our own FFEL loans that Mohila in fact owns. And when individuals refinance or consolidate those loans to take advantage of the SAVE plan, Mohila loses out on interest revenue. So any aspect of the final rule that is encouraging people to refinance their Mohila-owned loans into these direct loans is going to lead to a direct interest revenue harm to Mohila. And I understand my friend on the other side in their second brief, they acknowledge at page 34 of their second brief that the final rule is in fact a reason why people refinance. Going back to the text, the third point I'd like to highlight is that my friend's interpretation makes a mockery of the entire statute. Your Honor mentioned the IBR program. Biden against Nebraska discusses this idea that certain topics... Congress intended certain topics to remain with Congress. And forgiveness, that describes forgiveness to a T because there are all of these different forgiveness provisions in the Higher Education Act. But Congress said, okay, this one's going to be limited by income, this one's going to be limited by job type, et cetera. And I think IBR is a particularly salient example of this because recall that Congress passes this in 2007. It has income eligibility requirements that are enshrined in statute. It has payment schedules that are enshrined in the statute. And then President Obama three years later says, Congress will make this more generous. So Congress does so, they pass another statute. And my friend on the other side is now saying, all of this was unnecessary. This back and forth between Congress and the President passing this legislation, amending it later, it was all unnecessary because we could have done this the whole time through a flick of the pen using ICR. In fact, at page 43888 of the final rule, they admit there's basically no reason for an undergraduate borrower ever to use the IBR program anymore. This SAVE plan is more generous in every respect. Now they say for graduate-level borrowers, maybe it's a little different. IBR is 20 years forgiveness and the SAVE plan is 25. But then in the same breath, they say, but we could change the SAVE plan. We could actually accelerate this for graduate borrowers too. And so there's really no denying that they are asserting an authority here to make the IBR program entirely superfluous. Now, Judge Grunder, you asked, what about, they note IBR is after ICR, and Judge Grunder, you asked, well, what about before ICR? What was happening before then? And I didn't hear my friend on the other side mention the third income-based program, which preexisted ICR. And that was income-sensitive repayment. This is 20 U.S.C. 1078. Income-sensitive repayment is almost identical to income-contingent repayment. The difference is that income-sensitive repayment applied to the FFEL loans, whereas ICR is the direct loans. And income-sensitive repayment had a 10-year cap rather than a 25. And the Secretary, for the entire period of time, this income-sensitive repayment plan has existed, even though it's pretty much identical to ICR, the Secretary has always understood that this doesn't permit forgiveness. And so here we have a bunch of, you know, my friend talks in the brief about these two principles, this idea that you have, if you're going to have payments vary based on income and if you're going to have this cap, then it necessarily leads to forgiveness. That wasn't true in the ISR program. It's also not true in the IBR program. That's why you have an express forgiveness authority in that statute. Earlier in your argument, I may have misheard you, so correct me if I'm wrong, it sounded like you said that the ICR provision did allow some forgiveness, just not mass forgiveness. Sorry, the statutory provision does not allow for forgiveness. Now, they promulgated a plan that said you can get forgiveness. So the plan said you can get forgiveness. Now, that plan was wrong. Nobody sued over it, though, because almost nobody was actually getting forgiveness. I mean, remember ICR, you had to pay 20% of your income above the federal poverty level. So if you were a median American today, you would be paying back $9,000 a year. And so, you know, 99.99% of people in that kind of situation are actually going to repay their loans. So the statute didn't permit it, but the Secretary decided to do it anyway, even though the ISR, the previous plan, he had acknowledged that the previous plan did not allow for forgiveness. But nobody sued because it was a de minimis thing that really didn't matter. The fourth point I want to highlight for the Court today is just how absurdly far off their cost estimate is in the final rule. And I want to give the Court a particularly salient example. So my friend on the other side in their brief, they talk a lot about this 10 to 19 year provision, and they say, well, we estimated that this was only going to be $4 billion across 10 years. But we know since then, because the defendants have admitted it, that the cost of this one provision exceeded $5 billion in seven weeks between February and April. And if you extrapolate that across 10 years, that's not $4 billion like the cost estimate was. That's $400 billion. And so there's really no denying that this cost estimate was off by hundreds and hundreds of billions of dollars. My friend has never denied that. They've never tried to provide an updated cost estimate. So instead, what they try to do is they try to hide behind harmless error, which, of course, is the government's burden to prove. And here we have a situation where Congress, under the Congressional Review Act, has a privileged vehicle, not subject to the filibuster, where Congress can go and rescind regulations. The House passes this. The Senate takes a vote, and it fails by one single vote. Now, in the OSHA case, the Major Questions Doctrine case, NFIB against Department of Labor, the Supreme Court, that was a very similar situation where one chamber of Congress had actually voted to repeal that, and the Supreme Court found this to be very meaningful. So it's a very similar situation here. And my friend on the other side, to prove that this is harmless error, what he has to show is that there's no conceivable world in which a senator flips their vote because they know instead of $4 billion, it's going to be $400 billion. And I don't think my friend on the other side can show that. Counsel, we're here on the government's appeal of the granting of a preliminary injunction. And so when we assess the probability of success on the merits, can you tell me whether we should assess that on the fair chance standard or the more rigorous likely to prevail standard? I think the district court applied the fair chance standard. I can't recall which one the district court did. I think this court's injunction pending appeal cited cases from both. I'm not sure exactly which one under the Eighth Circuit's doctrine matters. I know there are cases applying both. I think we easily prevail under either standard. I mean, I didn't understand my friend to even – my friend didn't even raise an argument earlier on the major questions doctrine. Two district courts have declared this to be unlawful. This went up to the Supreme Court in August. The Supreme Court, without dissent, denied their application. And so I think under either standard, it's very easy for us to prevail. So you've crossed a field seeking – I guess that's the question. Do you want us to remand to the district court to enjoin the final rule in its entirety? Is that what you're seeking? I think we would be satisfied with this court perpetuating the injunction pending appeal or something similar to that. So the district court had initially enjoined only the 10- to 19-year forgiveness provision. Is it a final injunction or a preliminary? It's preliminary at this point. So why wouldn't it go back to the district court? I think it would go back to the district court. I understand my friend from his filings in the Supreme Court, I understand they are very likely to assert petition. Well, that's a different question. They have to grant cert for that. But yes, it's a preliminary injunction procedure before this court right now. What you'd be seeking for us to do is to remand with instructions to enjoin the entire final rule. Either that or something similar to the current injunction pending appeal. Okay. So my question is why should we enjoin the family size and deferment provisions of the final rule? So for a couple different reasons. Number one, those are harming us just as much as the other ones are. So my friend on the other side points out, okay, there's this previous 20-year and 25-year forgiveness provision. But what they've done is they've blasted open the eligibility for that. So you can't just isolate the forgiveness provision from the eligibility for forgiveness provisions. And so the marriage income provision, for example, it basically slashes in half the income that they're counting. And so it's going to drastically increase the number of people who could get forgiveness under these programs. So that's number one. Number two, as the Ascendium case makes clear, as the Career Colleges case from the Fifth Circuit makes clear, vacater is the standard remedy in the APA context. And so really if this rule is unlawful, then all the provisions have to go. Unless there are further questions from the Court, I'd just like to very quickly close and say that it is often said that Congress doesn't put elephants into mouse holes. Well, into this mouse hole, the Secretary tries to fit a whole circus. We ask that the Court confirm that the Secretary's unbounded assertion of authority is unlawful. Thank you. Thank you. Mr. Pullum, as I said, I'll allow a couple minutes in rebuttal. Thank you very much. I will go quickly through these points. One, there are limiting principles on the Secretary's ability to reform ICR plans. Those are the principles in the statute. And indeed, the Department declined to set the protected income threshold even higher because it said it wasn't appropriate to do so. And that's a limit in the statute. Two, counsel said that IBR was rendered superfluous. This is not true. Under IBR, payments are capped at what they would be under the standard plan. That is not true for repay and save. So borrowers with high incomes and high debt levels will prefer to be on IBR instead of on repay. Third, on harmless error, Missouri asserts that it's the government's burden to demonstrate harmless error, for which it cites a criminal case. The rule under the APA is different, as I assume the Court knows. It's the challenger's burden under the APA to demonstrate harmless error. Counsel referred to this rule as blasting open eligibility for forgiveness. I'm not entirely sure what this means. Apart from the shortened timeline to forgiveness, a borrower still has to submit, have the same number of qualifying payments. All that's changed are the amount of payments in some circumstances. And when the borrower gets to the end of the payment term, Missouri should be indifferent as to whether there is forgiveness or the loan is entirely paid off. Under its merits theory, the loan has to be paid off at the end. So the two possibilities there are a zero balance or forgiveness, and either way, MoHELA's payments end at that point. And thank you very much for the two extra minutes. Thank you, Mr. Pullman. The Court appreciates both counsel's appearance and argument today. The case is submitted and we'll issue an opinion in due course. The Court will be in recess until 2 o'clock this afternoon. Thank you.